**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEO TECHNOLOGIES, LLC,** | : | |
| | : | **Case No. 2:26-cv-00829** |
| **Plaintiff,** | : | |
| | : | **Judge Edmund A. Sargus** |
| **-vs-** | : | |
| | : | **Magistrate Judge Chelsey M. Vascura** |
| **FLASH AI, LLC,** | : | |
| | : | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | : | |
| | : | |

## FIRST AMENDED COMPLAINT

Plaintiff Leo Technologies, LLC ("LeoTech"), by and through counsel, files this First Amended Complaint against Flash AI, LLC d/b/a Flash AI ("Flash AI") and states as follows:

## PRELIMINARY STATEMENT

1. LeoTech has spent nearly a decade developing state-of-the-art, AI-powered technology that provides investigative intelligence for the public safety and criminal justice sectors. LeoTech has enjoyed substantial success in implementing its technology in numerous institutions.

2. The Ohio Department of Rehabilitation and Correction ("ODRC") issued a Request for Proposal ("RFP") in search of a partner to implement a proven system of monitoring inmate communications across Ohio's prison system in the United States, the fifth-largest prison system in the country, comprising twenty-eight institutions holding roughly forty-five thousand incarcerated individuals.

3. Flash AI responded to the RFP with numerous material misrepresentations about Flash AI's supposed experience and capabilities, including that Flash AI had worked hands-on with Ohio state and law-enforcement agencies since 2023. To the contrary, however, Flash AI did

not exist until October 2025, and its only previous implementations included a single, sixty-day pilot at one Ohio prison and short-term engagements with a suburban police department and a county sheriff's office.

4. In addition, Flash AI told ODRC that Flash AI could deploy its system fully and immediately even though Flash AI's own documents stated that full implementation would take at least twelve weeks.

5. Flash AI told ODRC that Flash AI met every applicable FBI Criminal Justice Information Services ("CJIS") security control, when Flash AI's own submissions conceded that Flash AI could not support privileged access management and did not maintain ransomware backup protection. By ODRC's own sworn account, Flash AI's platform ingested more than 165 million minutes of inmate conversations by mid-July 2026, thus putting at risk the conversations of tens of thousands of incarcerated people and the family members and others who were on the calls.

6. Additionally, Flash AI never signed the certification that the ODRC required vendors to provide with their proposals. Flash AI listed as references the very ODRC officials who would go on to score Flash AI's bid—without, according to one of the references, ever asking his permission. Although ODRC's request for proposals weighted technical merit at roughly 80 percent, and LeoTech earned the highest technical score of any bidder, Flash AI won the contract on price.

7. Flash AI's product also uses inventions protected by LeoTech's patents. Those patents concern, among other things, innovative methods and systems of turning recorded jail and prison calls into searchable intelligence: automatically transcribing each call; tagging it with who placed it, whom they called, and for how long; tracking call activity by location; and letting

investigators search and filter calls by date, place, person, keyword, and call frequency. LeoTech spent years building its Verus™ platform, which is now used by fourteen state corrections departments, and which was selected this year by the Federal Bureau of Prisons. Within months of its founding, Flash AI was offering the same patented functionality. The agreement that Flash AI's president signed to obtain Ohio's inmate-call recordings even referred, by name, to LeoTech's "Verus System."

8. When LeoTech asked Flash AI to explain how Flash AI's platform works, Flash AI refused to say and declared the matter "closed." Ohio's public records answered instead. Flash AI's own white paper, training guide, and pilot report confirm that Flash AI's platform practices LeoTech's patented methods and systems—and that Flash AI's platform did so on every inmate call at an Ohio prison before Flash AI ever won the contract.

9. This case is about more than one contract. Monitoring prison communications is how corrections officials identify threats, solve crimes, and respond to mental-health crises. Public agencies that entrust that work, and that data, to a vendor are entitled to the truth about what the vendor can do. Flash AI did not tell Ohio—or LeoTech—the truth. LeoTech asks this Court to hold Flash AI accountable for its misrepresentations—and to stop Flash AI's unauthorized use of LeoTech's patented technology.

## NATURE OF THE ACTION

10. This action arises from false and misleading representations made by Flash AI to the ODRC on or about April 6, 2026, which Flash AI used to secure a substantial contract from ODRC in connection with ODRC's Request for Proposal for Offender Communication Monitoring and Transcription Services ("RFP") and from Flash AI's infringement of two LeoTech patents, U.S. Patents Nos. 11,258,895 ("the '895 Patent") and 11,838,440 ("the '440 Patent") (collectively, "the Asserted Patents," attached hereto as Exhibits A and B).

11. As a competing bidder on the RFP, LeoTech has been, and continues to be, injured by Flash AI's deceptive practices and unlawful conduct.

12. LeoTech asserts claims for false or misleading representations under the federal Lanham Act, Ohio's Deceptive Trade Practices Act, and common law.

13. LeoTech further asserts claims for patent infringement under 35 U.S.C. § 271 and seeks a judgment of and relief from Flash AI's infringement.

## **THE PARTIES**

14. LeoTech is a Delaware limited liability company authorized to do business in the State of Ohio and maintains its principal place of business in Travis County, Texas, at 1515 S. Capital of Texas Hwy., Suite 220, Austin, Texas 78746.

15. Upon information and belief, Flash AI is an Ohio limited liability company that maintains its principal place of business in Licking County, Ohio, at 91 South 30th Street, Newark, Ohio 43055.

## **JURISDICTION AND VENUE**

16. This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*; the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; and Ohio law. This Court has subject-matter jurisdiction over LeoTech's patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a), and over its Lanham Act claim under 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121(a). The Court has jurisdiction over LeoTech's state-law claims under 28 U.S.C. § 1338(b) because those claims are joined with substantial and related claims under the federal trademark and patent laws, and under 28 U.S.C. § 1367(a), because they form part of the same case or controversy.

17. The Court has personal jurisdiction over Flash AI because Flash AI is a resident of Ohio, maintains its principal place of business in Ohio, made the false and misleading

representations to ODRC giving rise to LeoTech's claims in Ohio, and committed acts of patent infringement in Ohio.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) as to LeoTech's Lanham Act and state-law claims, and under 28 U.S.C. § 1400(b) as to its patent infringement claims. Flash AI is an Ohio limited liability company with its principal place of business at 91 South 30th Street, Newark, Licking County, Ohio, and therefore resides in this District. In addition, Flash AI has committed acts of infringement in this District and has a regular and established place of business here, including its Newark offices. Flash AI's acts of infringement in this District include its performance of the claimed methods on inmate telephone calls taking place at the Warren Correctional Institution in Lebanon, Warren County, Ohio, from at least January 2026 through March 2026, as well as performing the claimed methods and selling and offering for sale the accused system within this judicial district, including, but not limited to, to the ODRC in Columbus, Ohio.

## FACTUAL BACKGROUND

### Flash AI's False and Misleading Representations

19. LeoTech is a leading provider of cutting-edge technology solutions specializing in AI-powered investigative intelligence for the public safety and criminal justice sectors.

20. LeoTech's proprietary Verus™ software platform delivers near-real-time transcription, translation, and continuous monitoring of authorized custodial communications.

21. LeoTech's Verus™ platform has processed over 4.5 billion minutes of conversations and 1 billion calls in production with 99.99% uptime.

22. LeoTech's customers have deployed LeoTech's Verus™ platform across multiple Departments of Correction and large-scale incarceration systems.

23. As of March 27, 2026, LeoTech's Verus™ platform supported 13,738 users across nineteen states, including fourteen Departments of Correction and 224 agencies covering 252 facilities.

24. LeoTech's Verus™ platform processes communications at enterprise scale while maintaining consistent performance and operational continuity.

25. As stated in the RFP, ODRC is the largest state agency in the State of Ohio and the fifth largest prison system in the nation, consisting of twenty-five (25) state-administered adult correctional institutions and three (3) privately-operated institutions.

26. ODRC issued the RFP to provide an offender communications analytics platform to increase the safety and security of designated corrections facilities, be accessible to law enforcement, and contribute to a safer Ohio.

27. ODRC's stated goal for the RFP was to provide a software-as-a-service, web-based online software analytics platform that integrates with existing offender communication systems and uses AI to analyze offender communications to provide threat detection, and analytical support for targeted and emergent intelligence-led investigations.

28. LeoTech submitted a bid proposal in response to the RFP.

29. Flash AI also submitted a bid proposal in response to the RFP.

30. On or about May 27, 2026, ODRC awarded Flash AI a contract as the winning bidder to the RFP ("Contract").

31. The 2026 RFP presented a rare and unusually concentrated competitive opportunity. ODRC has solicited this type of statewide inmate-communications contract only twice in more than twenty years. The 2026 solicitation was driven by a particular appropriation and was not part of a recurring or regularly scheduled procurement cycle.

32. Contracts of this kind typically extend for many years and are renewed rather than frequently re-competed or rebid. Thus, the loss of the 2026 RFP was not the loss of a short-term sale that LeoTech could readily replace, but instead was the loss of a singular, long-duration customer relationship that may not be re-competed for years.

33. The RFP also was directed to ODRC's unique operational environment and decision-makers, not to the public at large. The successful bidder's proposal becomes part of the resulting contract, and the requested scope was designed around ODRC's existing systems and statewide operations, including integration with ODRC's incumbent ViaPath system, service across ODRC's twenty-eight institutions. Moreover, this RFP is tailored to the ODRC's extraordinary call volumes that are uniquely large compared to other potential customers. Thus, the RFP's attachments and technical requirements existed only within the context of this ODRC procurement.

34. Opportunities with other customers and potential customers are equally rare and specialized. When an opportunity arises to compete for a new customer deployment, the bidders' proposals and promotional materials are drawn to the customer's requested scope, particular technical requirements, and unique operational environment.

35. The Ohio Secretary of State's records reflect that Flash AI was formed in October 2025.

36. Upon information and belief, Flash AI did not have a paying customer prior to executing the Contract with ODRC. As such, upon information and belief, when Flash AI submitted its bid proposal in response to the RFP, the ODRC was a substantial portion of, if not all of, Flash AI's customer or client base.

37. Flash AI's own proposal confirms how lacking Flash AI's record was. In that proposal, Flash AI reported just fifteen employees, only five of whom were directly engaged in the work the RFP described. Ex. C (Flash AI Proposal) at 13. Flash AI's "Prior Projects" consisted of a sixty-day pilot at a single ODRC institution and small-scale engagements with the Whitehall, Ohio, Division of Police and the Muskingum County Sheriff's Office. *Id.* at 21–23. ODRC, by contrast, houses approximately forty-five thousand incarcerated people in twenty-eight institutions. RFP at 2.

38. Contrary to Flash AI, LeoTech had already demonstrated to ODRC what a comprehensive, statewide deployment requires. In 2025, LeoTech conducted a ninety-day proof of concept for ODRC across nearly a dozen ODRC institutions, during which LeoTech's Verus system transcribed approximately 71.6 million minutes of conversations from more than five million calls for 228 active users. Ex. D (LeoTech Proposal) at 62; Ex. E (Kucinic Aff.) ¶¶ 33–34.

39. On or about May 28, 2026, ODRC notified LeoTech that Flash AI and ODRC had executed the Contract.

40. Promptly thereafter, LeoTech issued a public records request to ODRC related to the RFP ("Records Request").

41. Information provided by ODRC in response to LeoTech's Records Request shows that Flash AI unlawfully made false and misleading material representations to ODRC in connection with Flash AI's response to the RFP.

42. For example, Flash AI misrepresented that it was prepared to implement its Flash Signal system fully and immediately upon Contract execution.

43. Upon information and belief, however, Flash AI was not capable of implementing its Flash Signal system fully and immediately at the scale required by the RFP when Flash AI responded to the RFP.

44. Upon information and belief, Flash AI similarly was not capable of implementing its Flash Signal system fully and immediately at the scale required by the Contract when the ODRC awarded the Contract to Flash AI.

45. Upon information and belief, Flash AI is not currently capable of implementing its Flash Signal system fully and immediately at the scale required by the Contract.

46. Upon information and belief, Flash AI needs to hire and train at least two dedicated platform support specialists to fully implement its Flash Signal system.

47. Flash AI's own documents show that it would take at least <u>twelve weeks</u> for Flash AI to fully implement its Flash AI system at ODRC.

48. Flash AI misrepresented that it has extensive experience working with multiple Ohio state and law enforcement agencies processing the categories of data that correctional institutions generate every day.

49. When Flash AI responded to the RFP, Flash AI had only existed for approximately six months and, upon information and belief, only had experience administering a very small number of pilot programs and demonstrations.

50. Flash AI misrepresented and misleadingly suggested that Flash AI worked hands-on with multiple Ohio state and law enforcement agencies beginning in 2023.

51. Flash AI does not identify any individuals who worked hands-on with such agencies beginning in 2023. Moreover, because Flash AI did not come into existence until October

2025, Flash AI could not have been working hands-on with any agencies at any time before then, let alone all the way back to 2023.

52. Flash AI misrepresented that it meets all applicable CJIS Security Policy controls.

53. For example, Flash AI acknowledges its system cannot support a Privileged Access Management solution.

54. Flash AI also admits that it fails to maintain ransomware backup-protection.

55. Additionally, upon information and belief, Flash AI still has not conducted a privacy impact assessment.

56. Avoiding security lapses is of great import to the state and its residents, as recorded conversations between incarcerated individuals and their family members and friends, along with personally identifiable information and telephone records associated with those calls, are extremely sensitive. *See* Ex. F (ViaPath Data Facilitation Agreement) § 10. By ODRC's own sworn account, as of July 13, 2026, Flash AI's platform had ingested and processed 165,350,266 minutes of these conversations—more than 17 terabytes of data—from all twenty-eight ODRC institutions, putting all of these inmates and their associates at risk. Ex. E (Kucinic Aff.) ¶¶ 7, 15.

57. Upon information and belief, Flash AI further misrepresented its ability to perform its obligations under the Contract at the price that Flash AI offered.

58. Flash AI made false statements concerning, and omitted material facts regarding, the reasons that Flash AI is offering its solution at a reduced rate.

59. Specifically, the price included in Flash AI's bid proposal is highly speculative given that Flash AI's Flash Signal system is unproven at the scale required by the RFP and Flash AI does not currently employ the number of individuals required to perform the required services.

60. Flash AI's false and misleading representations are material because Flash AI made those statements directly to ODRC in writing and, upon information and belief, expected and intended ODRC to rely on and use those statements, in whole or in part, as a basis to award the Contract to Flash AI.

61. Upon information and belief, but for Flash AI's false and misleading material representations to ODRC and material omissions, ODRC would have awarded the Contract to LeoTech.

62. LeoTech has been harmed as a result of Flash AI's false and misleading representations and material omissions to the extent they caused ODRC to award the Contract to Flash AI.

63. Flash AI's false and misleading representations and material omissions are irreparably injuring LeoTech because, among other things, these statements and omissions are likely to cause LeoTech to lose sales and relative share in the market for AI-powered investigative intelligence for the public safety and criminal justice sector.

**Flash AI's Infringement of the Asserted Patents**

64. LeoTech has spent nearly a decade developing technology by and for law enforcement agencies to address a long-felt need for an efficient, effective way to monitor vast amounts of correctional-facility communications and quickly search for critical information within specific calls to mitigate criminal activity, solve crimes, and even assist with mental health issues.

65. LeoTech's Verus™ platform has become a highly valuable resource to help correctional facilities monitor and respond to potentially unsafe situations. By the end of 2020, LeoTech's Verus™ platform was already being safely and effectively used in jurisdictions across the country. For example, in late 2020, the Houston Police Department's Chief of Police lauded

the positive impacts of Verus™ on law enforcement practices, explaining that "we deployed Verus by LeoTech in August 2020, and it is one of the best force multipliers for my agency in its pursuit to make our communities safer and our agency more responsive," and that, "[t]hrough this technology, we are working in near real time with all of our stakeholders at every level of government and are impacting issues facing Houston and communities throughout our state." Ex. G.

66. To protect its innovations, LeoTech filed U.S. Patent Application. No. 16/986,006, which would later become the '895 Patent, on August 5, 2020. On February 21, 2022, LeoTech filed U.S. Patent Application No. 17/676,676, which would later become the '440 Patent. Each of these patents relates to, among other things, LeoTech's Speech-To-Text Processing and Analysis technology.

67. Among other things, the Asserted Patents describe innovative methods and systems of turning recorded jail and prison calls into searchable intelligence: automatically transcribing each call; tagging it with who placed it, whom they called, and for how long; tracking call activity by location; and letting investigators search and filter calls by date, place, person, keyword, and call frequency.

68. The '895 Patent was duly and legally issued on February 22, 2022, for an invention titled "Automated Speech-To-Text Processing And Analysis Of Call Data Apparatuses, Methods And Systems."

69. The '440 Patent was duly and legally issued on December 5, 2023 for an invention titled, "Automated Speech-To-Text Processing And Analysis Of Call Data Apparatuses, Methods And Systems."

70. LeoTech owns all rights to the Asserted Patents that are necessary to bring this action, including all rights to sue for infringement and to recover past and future damages. LeoTech is the owner by assignment of the Asserted Patents.

71. Flash AI is not currently licensed to practice the Asserted Patents.

72. The Asserted Patents are valid and enforceable and are entitled to a statutory presumption of validity under 35 U.S.C. § 282.

73. The methods and systems claimed in the Asserted Patents are directed to specific improvements in the operation of computerized call-monitoring systems, not to merely the concept of reviewing telephone calls. Before the invention, correctional facilities recorded inmate calls but could not efficiently use them, because analyzing call activity by location required reviewing or repeatedly re-querying large volumes of recorded call data. *See, e.g.*, '440 Patent, 1:35-52; 2:58-3:15. The claimed methods and systems require a specific arrangement in which machine transcripts are associated with structured call metadata, stored in a database, and used to create running totals of call frequency and duration keyed to location within or across facilities, which the user interface then makes selectively searchable by time period, location, person, keyword, and call frequency. The specification explains that these running totals may be computed as each call is processed and stored as separate database entries joined to a location mapping table, enabling location-specific aggregates to be retrieved on demand. *See, e.g., id.*, FIGS. 14, 16, 12:43-13:27; 14:5-35. This arrangement was not well-understood, routine, or conventional as of February 27, 2018.[1]

---

[1] References to text in the Asserted Patents are by column and line number, separated by a colon. For example, "'440 Patent, 1:33" refers to Column 1, line 33 of the '440 Patent.

74. Verus™ and related technologies produced by LeoTech have helped significantly alleviate numerous public health and safety concerns. For example, in 2020, Verus's cloud-based inmate monitoring software helped jails and prisons respond to the emergency conditions brought on by the COVID-19 pandemic. In December of 2020, LeoTech was one of only sixteen companies worldwide to be added to the Amazon Web Services Public Safety and Disaster Response Competency.

75. In recent years, LeoTech has begun incorporating Agentic AI-powered data analytics tools into its existing technology to further its long-standing mission to enable intelligence-led policing by streamlining access to information. LeoTech has enjoyed substantial success with its AI-enabled features. For example, on May 14, 2026, LeoTech was awarded a five-year contract by the Federal Bureau of Prisons to provide AI-enabled translation and transcription services supporting authorized inmate communications monitoring and investigative operations.

76. By contrast, Flash AI is a recent entrant into this specialized market, purporting to provide tools for investigative intelligence ("Flash PD"), jail call intelligence ("Flash Signal"), and secure agency AI ("Flash Chat").

77. Unlike LeoTech, Flash AI does not have a long history of providing inmate-call transcription services to correctional institutions. Before it won the Contract, Flash AI's platform had been used by only a handful of Ohio agencies, nearly all of them on a trial basis.

78. Two of these customers accessed the technology via pilot programs: one with Muskingum County Sheriff's Office in Zanesville, Ohio and the Guernsey County Sheriff's Office in Cambridge, Ohio. Ex. H. On information and belief, as of the filing of this complaint, neither department currently utilizes the Flash AI platform.

79. On information and belief, as of the filing of this complaint, Flash AI has only a handful of active customers, including the Whitehall, Ohio, Division of Police and the Perry Township Police Department in Dublin, Ohio. The Whitehall Division of Police consists of fewer than fifty sworn law-enforcement officers and has no affiliated long-term jail. The Perry Township Police Department consists of only fifteen sworn law-enforcement officers and also has no affiliated long-term jail.

80. Flash AI's current leadership team was installed only recently, and several of its key personnel have limited or no prior experience with correctional technology. On information and belief, Ethan Knotts became CTO of Flash AI in December of 2025 with no prior correctional technology experience.

81. Moreover, on information and belief, it was not until March of 2026 that current CEO Errol Doebler and current Chief Solutions Officer Jennifer Doebler joined Flash AI.

82. On information and belief, almost immediately upon market entry, Flash AI began offering an inmate-call transcription service containing the same or substantially the same patented functionality that Plaintiff spent years developing and commercializing.

83. Flash AI's limited technical and institutional history underscores that its recent market entry was not the product of a mature, independently developed correctional transcription platform. Rather, Flash AI's ability to compete for correctional customers relies on its unauthorized use of LeoTech's patented technology. Allowing an inexperienced market entrant to obtain major law-enforcement contracts and institutional credibility that it could not have earned through lawful competition threatens LeoTech's goodwill and distorts the market for inmate-call transcription services and undermines law enforcement's trust in the reliability and legitimacy of proven-reliable systems such as LeoTech's Verus™ platform.

**Flash AI's Infringing Use in Ohio's Prisons**

84. Between January and March 2026, Flash AI operated its Flash Signal platform on inmate telephone calls that took place at the Warren Correctional Institution ("WCI") in Lebanon, Ohio. Flash AI's own report on that pilot states that Flash Signal "automatically ingested, transcribed, and analyzed every inmate phone call" at WCI—242,604 calls comprising 3,082,663 minutes—and tracked 7,642 external telephone numbers. Ex. I (Flash Signal DRC-WCI Pilot Report).

85. Since June 10, 2026, Flash AI has used the same platform under the Contract across all 28 ODRC institutions. According to a sworn affidavit that ODRC submitted in LeoTech's state-court action, by July 13, 2026, Flash AI's platform had reviewed 9,994,171 inmate telephone calls and ingested and processed 165,350,266 minutes of recorded conversations, and ODRC had paid Flash AI approximately $1 million for the month of June 2026 alone. Ex. E (Kucinic Aff.) ¶¶ 4, 7, 15, 32.

86. Flash AI has also offered, demonstrated, and deployed the same platform to other agencies, including the Whitehall Division of Police, the Perry Township Police Department, and the Muskingum County Sheriff's Office.

87. Upon information and belief, Flash AI continues to offer and deploy this same platform to other customers. LeoTech's claims extend to all of Flash AI's infringing uses of its platform, whenever and wherever they have occurred or occur.

88. Flash AI knew of Verus no later than December 29, 2025. On that date, Flash AI's President signed a data facilitation agreement among ODRC, ODRC's inmate-telephone provider ViaPath Technologies, and Flash AI that gave Flash AI near-real-time access to ODRC's inmate call recordings and associated metadata. Ex. F (ViaPath Data Facilitation Agreement) §§ 1, 3. The

agreement Flash AI signed refers to "the resulting text after processing through the Verus System," to "Verus transcriptions," and to "the Verus Software"—terminology drawn from LeoTech's Verus platform. *Id.* §§ 10, 12.

**Flash AI's Knowledge of LeoTech's Patents and Refusal to Provide Information**

89. On June 25, 2026, LeoTech sent a notice letter to Flash AI stating its belief that Flash AI "may be offering certain software products, including at least its Flash PD and Flash Signal products, without having or securing from LEO Tech the requisite intellectual property rights to do so" and asking Flash AI to provide information about the Flash AI platform. Ex. J.

90. On July 7, 2026, having received no substantive response, LeoTech followed up on its correspondence via email. Ex. K.

91. On July 10, 2026, counsel for Flash AI responded, citing litigation that LeoTech had initiated in Ohio state court and stating that "we will be unable to revert back to you today while we address this other matter." Ex. L.

92. On July 17, 2026, still having received no substantive response, LeoTech followed up again on its correspondence via email. Ex. M.

93. On July 19, 2026, Flash AI responded, refusing to provide any of the requested information, stating in conclusory fashion that it was "confident that no patent infringement of any LeoTech patents has occurred to date" and "considers this inquiry closed," and asserting that "we believe these inquiries are better raised in formal discovery through your client's newly filed lawsuit in the Southern District of Ohio, which alleges violations of the Lanham Act, rather than through extrajudicial discovery," i.e., this action. Ex. N.

94. Around the time LeoTech sent the notice letter to Flash AI, LeoTech submitted a request to the ODRC under the Ohio Public Records Act ("OPRA") for relevant information and

communications exchanged between Flash AI and ODRC. Ex. O. On August 26, 2026, ODRC responded to the OPRA request, objecting to almost the entirety of LeoTech's requests. Ex. P. In addition to objecting to the majority of the requests, ODRC identified and produced 225 pages of email correspondence with Flash AI "for the period of June 1, 2026, and August 6, 2026, between DRC staff Gene Jarvi, Vinko Kucinic, or Mark Stegemoller and staff at Flash AI regarding the services provided by Flash AI to DRC." Ex. P, p. 1.

95. ODRC made three additional, supplemental productions of documents. On September 16, 2026, ODRC produced 3,508 pages of internal ODRC emails with numerous, lengthy attachments that covered communications discussing the RFP evaluation process between April 7, 2026, and June 17, 2026.

96. On September 18, 2026, ODRC produced 272 pages of internal ODRC emails and ODRC emails with Flash AI, spanning September 10, 2025, to March 19, 2026, containing discussions regarding Flash AI's WCI pilot program.

97. On September 19, 2026, ODRC produced an additional 2,967 pages of internal ODRC emails and ODRC emails with Flash AI discussing Flash AI's WCI pilot program between September 10, 2025, and March 18, 2026.

98. The ODRC's September 2026 productions included information regarding the functionality of the Flash AI system, including a Flash Signal Training Guide.

## CLAIM I
## UNFAIR COMPETITION UNDER THE LANHAM ACT

99. LeoTech incorporates the foregoing paragraphs as though fully set forth here.

100. Flash AI made false or misleading descriptions of fact and/or false or misleading representations in commerce in connection with its goods and services in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

101. By way of example and not limitation, Flash AI made representations to ODRC in a commercial promotion that misstated and/or failed to disclose material facts about Flash AI's system, system capabilities, and experience, including Flash AI's ability fully and immediately to implement its program, meet all applicable CJIS requirements, and perform fully pursuant to the Contract at the price that Flash AI offered.

102. Upon information and belief, the representations in the preceding paragraph were material because they influenced the ODRC's decision to award the Contract to Flash AI.

103. As a result of Flash AI's misrepresentations, ODRC mistakenly believed it was purchasing a comparable product at a reduced cost, when it was in fact purchasing an inferior product that does not meet the minimum standards required by the RFP.

104. As a direct and proximate result of Flash AI's false and misleading representations, LeoTech is suffering actual economic injury, including the loss of a substantial contract with ODRC and the resulting revenues and profits.

105. As a direct and proximate result of Flash AI's false and misleading representations alleged herein, LeoTech is suffering immediate and irreparable injury to its goodwill and reputation.

106. Unless restrained by the Court, Flash AI will continue to make false and misleading statements about Flash AI's Flash Signal system and will continue to profit from those false and misleading statements, leading LeoTech to suffer further irreparable injury and harm for which it has no adequate remedy at law.

## CLAIM II
## UNFAIR COMPETITION
## UNDER THE OHIO UNIFORM DECEPTIVE TRADE PRACTICES ACT

107. LeoTech incorporates the foregoing paragraphs as though fully set forth here.

108. Flash AI's conduct constitutes unfair competition and deceptive trade practices in violation of the Ohio Uniform Deceptive Trade Practices Act, O.R.C. § 4165.01, *et seq*.

109. Flash AI's commercial claims about Flash AI's experience, ability to implement its program, and meet all applicable CJIS requirements misrepresent the characteristics, ingredients, approval, uses, benefits, or quantities of Flash AI's Flash Signal system.

110. Flash AI's commercial claims about the cost of Flash Signal have a tendency to deceive, and upon information and belief have deceived, ODRC because Flash AI cannot reliably and continually provide the required services at the offered price.

111. As a direct and proximate result of Flash AI's false and misleading representations alleged herein, LeoTech is suffering actual economic injury, including the loss of a contract with ODRC and the resulting revenues and profits.

112. As a direct and proximate result of Flash AI's false and misleading representations alleged herein, LeoTech is suffering immediate and irreparable injury to its goodwill and reputation.

## CLAIM III
## UNFAIR COMPETITION AND DECEPTIVE TRADE PRACTICES UNDER OHIO COMMON LAW

113. LeoTech incorporates the foregoing paragraphs as though fully set forth here.

114. Flash AI's conduct constitutes unfair competition and deceptive trade practices in violation of Ohio common law.

115. Flash AI's false and misleading representations about Flash AI's platform outlined herein are material and have a tendency to deceive, and upon information and belief have deceived, ODRC because, among other things, they influence and influenced decisions concerning the award of substantial public contracts.

116. Flash AI's false and misleading representations about Flash AI's platform outlined herein are material and have a tendency to deceive, and upon information and belief have deceived, ODRC because they unfairly disadvantaged, and continue to disadvantage, LeoTech and other businesses that compete directly with Flash AI.

117. Flash AI's false and misleading statements about Flash AI's platform were willful because Flash AI knew the statements were untrue and made those representations with the intent to induce customers like the ODRC into awarding contracts to Flash AI and not to Flash AI's competitors.

118. As a direct and proximate result of Flash AI's false and misleading representations alleged herein, LeoTech is suffering actual economic injury, including the loss of a contract with ODRC and the resulting revenues and profits.

119. As a direct and proximate result of Flash AI's false and misleading representations alleged herein, LeoTech is suffering immediate and irreparable injury to its goodwill and reputation.

## CLAIM IV
## INFRINGEMENT OF THE '895 PATENT

120. LeoTech incorporates the foregoing paragraphs as though fully set forth here.

121. Flash AI infringes, induces, and/or contributes to infringement of the '895 Patent by performing each step of the claimed method by using call monitoring and analysis tools, including without limitation the Flash AI platform, by encouraging others to use call monitoring and analysis tools, including without limitation the Flash AI platform, and/or by selling call monitoring and analysis tools, including without limitation the Flash AI platform, that contain components that are especially made and adapted for the purpose of performing the claimed method and have no substantial noninfringing use.

122. For example, and without limitation, the Flash AI Platform, including through its Flash Signal and Flash PD operations, infringes at least claim 1 of the '895 Patent. *See* Ex. Q. (describing Flash Signal and Flash PD as part of "[o]ne secure, integrated platform.").

123. For example, and without limitation, to the extent the preamble is limiting, the Flash AI "Flash Signal" product practices a method of providing a user interface for accessing information related to telephone calls at a facility. Ex. R.




124. The Flash AI "Flash Signal" product further practices the step of receiving a plurality of audio files corresponding to a plurality of telephone calls from one or more telephones at said facility. For example, and without limitation, Flash AI explains that the workflow of Flash Signal comprises a step wherein "Flash Signal connects to your facility's call recording system. Calls flow in as they happen, or historical libraries can be uploaded in batch." Ex. R.




125. "Flash Signal" further practices the step of translating each audio file into a transcript that is text-searchable. For example, and without limitation, Flash AI explains that the workflow of Flash Signal comprises a step wherein "every call is transcribed automatically with speaker identification" and "hours of audio become searchable text within minutes of the call ending." Ex. R.




126. "Flash Signal" further practices the step of associating metadata with each transcript, said metadata including a caller ID that identifies a person at the facility, a phone number associated with a third party, and a call duration. For example, and without limitation, in the Flash AI platform, "every call [is] transcribed with speaker ID." Ex. R; Ex. S.


Transcription & Summary
Every call transcribed with speaker ID and condensed to a clear summary.


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Network Graph
Expand
Expand
Lane, Corey
View Details
Frequent Contacts
No contacts found.
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1




127. As an additional example, and without limitation, Flash AI explains that Flash PD practices "[t]ranscription compliant with CJIS requirements, with speaker diarization." Ex. T. On information and belief, Flash AI's diarization associates the transcription with metadata, including a person at the facility, a phone number associated with a third party, and a call duration.






128. As another example, without limitation, the “Flash Signal” dashboard displays a “Calls Snapshot” entry with a resident identifier (“RES-9575”), a duration (“32s”), and a third-party telephone number. Ex. S.




129. "Flash Signal" and "Flash PD" further practice the step of storing each of the plurality transcripts and associated metadata in a database. For example, and without limitation, Flash AI explains that Flash uses various encryption and storage methods to store content and its associated metadata in one place. Ex. U.

### 4.2 DATA AT REST

Flash uses AWS-managed and customer-managed **KMS keys** across the estate. Typical patterns include:

- **Object storage (S3)** with server-side encryption (managed keys or KMS).
- **Relational databases (RDS / Aurora)** with storage encryption via KMS.
- **DynamoDB** with encryption at rest (default or KMS-backed where configured).
- **Secrets Manager** secrets encrypted with KMS.
- **Block storage (EBS)** encrypted where provisioned.
- **Kubernetes (EKS)** envelope encryption for cluster secrets where enabled.
- **CloudTrail** log encryption and integrity validation.

130. As another example, and without limitation, Flash AI explains that the Flash AI platform connects and analyzes evidence from a variety of user-end systems. Ex. V.

**Doesn't my current evidence platform already do this?**

No. Most platforms store evidence from their own hardware only. Flash AI connects and analyzes evidence from all your systems: body cam video, phone extractions, case management data, documents, everything. We're the investigation layer that sits on top of all your data silos.

131. "Flash Signal" further practices the step of creating data analytics by storing running totals of call frequency and duration of calls by location at said facility. For example, and without limitation, demonstrations of the Flash Signal Platform show that Flash Signal tracks and stores at least: (i) the duration of a given call made or received by a given inmate; (ii) the number of weekly and monthly calls made or received by said inmate; (iii) the "Frequent Contacts" of said inmate; and (iv) the "facility location" of said inmate. On information and belief, the number of calls and identification of frequent contacts is continuously or periodically updated. Ex. S; Ex. W at 14.


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1
Lane, Corey
View Details


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1
Lane, Corey
View Details

Available options include:

- **Rows per page:** 25, 50, or 100
- **Table density:** Compact, Normal (default), Comfortable
- **Visible columns:** Toggle additional data fields such as:
  - Inmate ID
  - Facility location
  - Language
  - And more

**Click Apply Settings to save changes.**




132. "Flash Signal" further practices the step of providing said user interface on a display of a computer that has access to said database, said user interface displaying a call list of calls in a field, each call in the call list having access to associated metadata, said user interface further includes one or more filters for selectively displaying a number of calls during a particular period of time including by said location at said facility, and one or more users and call frequency of said one or more users. For example, and without limitation, the "Flash Signal" user interface "links

directly back to the original evidence" and displays lists of "Frequent Contacts" and recent calls alongside the location of those calls and their risk level, with the lists being filterable by location, day, week, and month. Ex. X; Ex. T; Ex. S; Ex. W at 19. As an additional example, and without limitation, on information and belief, call frequency can be discerned by filtering on the "Flash Signal" user interface with reference to the "Frequent Contacts" panel and/or to the "Date" and "Status" filtering options.

> **How does this hold up in court?**
>
> Every AI output links directly back to the original evidence with exact timestamps. The investigator stays in control. Flash accelerates the analysis. It's fully auditable and defensible.




Flash Signal
Chat with Flash
Day
Week
Month
HIGH-RISK CALLS
0
Same as yesterday
AVG CALL DURATION
0.0 min
Same as yesterday
Status Pipeline
View All Calls
Pending 0
Processing 0
Completed 0
Failed 0
Top Risks Detected
No risks to display yet — check back later.
John Doe
Mar 30
HIGH
Devon Reed
Mar 7
LOW
Francisco Woods
Mar 7
LOW
Calls Snapshot
View All
RES-9575
Julie Park
32s
+1 (736) 555-7899
Chat History
Go To Chat
New Chat
2 minutes ago
New Chat
3 minutes ago
New Chat
4 minutes ago
Jail Call Analysis: Initial Contact


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Expand
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1
Lane, Corey
View Details

### 3.7 Searching and Filtering Calls

**Search Bar -** The search bar functions like a Google search:

- **Type keywords (names, objects, locations)**
- **Do not press Enter**
- **Results update automatically**




**Filters Panel -** Users can filter calls using two modes:

- **Match All –** Calls must meet all selected criteria
- **Match Any –** Calls meeting any selected criteria will appear

Filter options include:

- **Starred calls**
- **Date**
- **Risk level**
- **Objects**
- **Crime info**
- **Locations**
- **People**
- **Emotions**
- **Status**
- **Inmate ID**

133. As an additional example, and without limitation, on information and belief, the Flash "AI Chatbot with Chat Interface and AI Input Box" enables filtering results of searches according to call frequency. Specifically, for example, and without limitation, the Flash AI Chatbot

identifies "[c]all patterns (frequency, timing, duration) between specific individuals." In addition, on information and belief, the search bar and filters allow the selective display of calls based on call participants, location, date, keyword. Furthermore, on information and belief, the AI input box allows for natural language queries, so its capability of explicitly identifying call patterns such as frequency indicates the input box can be used to search calls based on frequency. Ex. W at 25, 28.

### 4.1 Chat Interface Overview

The main screen includes:

- **AI input box**
- **Model selector**
- **Right-side panel with:**
  - Insights
  - Calls
  - History



Once calls are loaded, users can ask questions such as:

- **Identifying contradictions**
- **Finding connections**
- **Tracking statements across calls**




134. Flash AI has directly infringed, and continues to directly infringe, claim 1 of the ’895 Patent under 35 U.S.C. § 271(a) by using the claimed method in the United States without authority, including, for example and without limitation, by performing each of its steps through the Flash AI platform on calls taking place at WCI and, upon information and belief, for ODRC under the Contract as well as by performing each of its steps while testing the Flash AI platform. Flash AI performs the receiving, associating, storing, and analytics steps on computer systems that it owns, leases, or controls, including systems hosted in Amazon Web Services GovCloud. Ex. W at 39; Ex. U. Flash AI performs the step of providing the claimed user interface by generating and serving the Flash Signal interface to users’ displays, including to Flash AI’s own personnel, who

were authorized to maintain user accounts to access WCI call data, and likely others' call data, through the platform. Ex. Y § 3.

135. To the extent any step of the claimed method is deemed performed by a Flash AI customer, that performance is attributable to Flash AI. Flash AI conditions its customers' use of Flash Signal on their use of the user interface that Flash AI designs, configures, hosts, and controls, and Flash AI establishes the manner and timing of that performance, including by provisioning user accounts, configuring the interface, determining which call data are ingested and when, and training users to operate the interface according to Flash AI's written instructions. Ex. W.

136. On information and belief, Flash AI has known or should have known of the '895 Patent, and of the manner in which the Flash AI platform infringes it, since no later than June 25, 2026. In addition, Flash AI has known or should have known of the '895 Patent, and of the manner in which the Flash AI platform infringes it, since no later than the service of this First Amended Complaint. Since that time, Flash AI has actively induced, and continues to induce, ODRC and its other customers to directly infringe by providing the Flash AI platform and instructing and training their personnel to use the infringing features, including through the Flash Signal Training Guide, which directs users step by step to review calls in the Call Records table, filter calls by date and inmate, view call metadata, and consult the Analytics module. Ex. W. On information and belief, Flash AI does so with the specific intent that those customers infringe by performing the claimed methods.

137. In addition, Flash AI contributes to the infringement of the '895 Patent under 35 U.S.C. § 271(c). ODRC and Flash AI's other customers directly infringe claim 1 by using Flash Signal in the United States. For example, since June 10, 2026, ODRC personnel at all twenty-eight

ODRC institutions have used it to review, search, and filter millions of inmate calls that Flash AI processes under contract on ODRC's behalf. Ex. E (Kucinic Aff.) ¶¶ 7, 15; Ex. W (Training Guide).

138. Flash AI sells and offers to sell in the United States subscriptions to, and licenses for, the components of Flash Signal that perform the claimed method. These are at least its Call Records module, its Analytics module, its search and filter functions, and the client-side software that generates its user interface (the "Accused Components"). Flash AI's customers include ODRC, which paid Flash AI approximately $1 million for June 2026 alone. Ex. E ¶ 32. The Accused Components are a material part of the claimed invention. They associate transcripts with inmate, telephone-number, and duration metadata; maintain running totals of call activity by location; and display and filter calls by time, location, person, and call frequency. *See* ¶ [69]; Ex. W at []. They are especially made and adapted for that purpose and have no substantial noninfringing use.

139. Flash AI has known of the '895 Patent, and that its customers' use of the Accused Components infringes it, since at least June 25, 2026, and, additionally, since the service of this First Amended Complaint. Flash AI nonetheless continues to sell, offer, and provide the Accused Components, including under the ODRC Contract. LeoTech has been damaged as a result and is entitled to damages under 35 U.S.C. § 284.

140. Moreover, Flash AI has had knowledge of the '895 Patent and of its infringement thereof at least since June 25, 2026, when LeoTech notified Flash AI that it had reasons to believe that Flash AI was "offering certain software products, including at least its Flash PD and Flash Signal products, without having or securing from LEO Tech the requisite intellectual property rights to do so." Ex. J. LeoTech's ownership of the Asserted Patents is a matter of public record freely available on the U.S. Patent and Trademark Office assignment recordation database, among

other places. A reasonable actor in Flash AI's position would have reviewed this database or similar publicly available information to identify the '895 Patent. Accordingly, Flash AI's infringement of the '895 Patent since at least June 25, 2026, has been and continues to be willful.

141. In addition, in response to LeoTech's June 25, 2026, letter, Flash AI refused to provide any of the requested information and instead stated in conclusory fashion that it was "confident that no patent infringement of any LeoTech patents has occurred to date" and "considers this inquiry closed." Ex. N. Flash AI further asserted that "we believe these inquiries are better raised in formal discovery through your client's newly filed lawsuit in the Southern District of Ohio, which alleges violations of the Lanham Act, rather than through extrajudicial discovery." *Id.* Flash AI provided no indication that it performed any type of infringement or validity analysis on the '895 Patent, nor that it explored making changes to the Flash AI platform to avoid infringement. Accordingly, at a minimum, Flash AI was willfully blind to its infringement once it learned from LeoTech about its infringement and, on information and belief, chose not to investigate the extent of its infringement further.

142. On Saturday, September 19, 2026, at 12:10 a.m. EDT, in response to LeoTech's OPRA, the ODRC supplied several thousand pages of technical information about the Flash AI platform that confirmed that Flash AI's platform practices the limitations of the '895 Patent, contrary to Flash AI's summary conclusion to the contrary.

143. Had Flash AI actually investigated how its platform practices the '895 Patent, Flash AI would have formed a subjective belief of a high probability of infringement of the Asserted Patents arising from Flash AI's, and others', use of the Flash AI platform. Harboring that subjective belief, Flash AI could have and should have undertaken efforts to redesign the Flash AI platform so that it did not infringe the '895 Patent.

144. Based on the foregoing, LeoTech is informed and believes, and thereon alleges, that Flash AI either knew affirmatively that it was infringing and/or deliberately failed to further investigate whether its use of the Flash AI platform infringed the ’895 Patent.

145. LeoTech is informed and believes, and thereon alleges, that after acquiring knowledge of the ’895 Patent and its relevance to the Flash AI platform at the latest in June 2026, Flash AI continued to use the Flash AI platform in a manner that infringed the ’895 Patent without (1) purchasing the ’895 Patent , (2) obtaining a license to the ’895 Patent , (3) appropriately investigating whether and/or to the extent to which it infringed the ’895 Patent , (4) designing around the ’895 Patent, or (5) taking any other actions to avoid infringing the ’895 Patent. By pursuing this course of action rather than behaving in a lawful manner, Flash AI improperly attempted to avoid paying fair compensation to LeoTech for its use of LeoTech’s patented technology and/or improperly attempted to avoid having to modify the Flash AI platform, which would have resulted in problems including production delays, increased costs, and/or decreased performance.

146. Flash AI has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for LeoTech’s patent rights. By way of example only, Flash AI has continued to use the Flash AI platform accused of infringing the ’895 Patent as of June 25, 2026. LeoTech is informed and believes, and thereon alleges, that Flash AI has taken no steps to design around the ’895 Patent in the Flash AI platform as it existed before June 25, 2026. By pursuing this course of action rather than behaving in a lawful manner, Flash AI improperly attempted to avoid paying fair compensation to LeoTech for its use of LeoTech’s patented technology and/or improperly attempted to avoid having to modify the Flash AI platform, which

would have resulted in problems including production delays, increased costs, and/or decreased performance.

147. Flash AI's willful infringement of the Asserted Patents is compounded by Flash AI's reckless disregard for or willful blindness of LeoTech's patent rights in view of the notice that Flash AI was provided with the filing of this First Amended Complaint. At a minimum, such filing gives rise to a subjective belief by Flash AI of a high probability of infringement by Flash AI's use of the Flash AI platform accused of infringing the Asserted Patents. However, Flash AI deliberately failed to investigate whether its use of the Flash AI platform infringed the '895 Patent. Having deliberately failed to perform an investigation of its own regarding whether its use of the Flash AI platform infringed the '895 Patent, Flash AI, at a minimum, willfully blinded itself to LeoTech's patent rights.

148. As a result of Flash AI's infringement of the '895 Patent, LeoTech has been damaged. LeoTech is entitled to recover enhanced damages for the damage it has sustained as a result of Flash AI's wrongful acts in an amount subject to proof at trial.

## CLAIM V
## INFRINGEMENT OF THE '440 PATENT

149. LeoTech incorporates the foregoing paragraphs as though fully set forth here.

150. Flash AI infringes, induces, and/or contributes to the infringement of the '440 Patent by performing each step of the claimed method by using call monitoring and analysis tools, including without limitation the Flash AI platform, by encouraging others to use call monitoring and analysis tools, including without limitation the Flash AI platform, and/or by selling call monitoring and analysis tools, including without limitation the Flash AI platform, that contain components that are especially made and adapted for the purpose of performing the claimed method and have no substantial noninfringing use.

151. For example, and without limitation, the Flash AI Platform, including through its Flash Signal and Flash PD operations, infringes at least claim 1 of the '440 Patent. *See* Ex. Q. (describing Flash Signal and Flash PD as part of "[o]ne secure, integrated platform."

152. For example, and without limitation, to the extent the preamble is limiting, the Flash AI "Flash Signal" product practices a method of providing a user interface for accessing information related to telephone calls at one or more facilities. Ex. R.




153. The Flash AI "Flash Signal" product further practices receiving a plurality of text-searchable transcripts corresponding to audio calls at said one or more facilities. For example, and without limitation, Flash AI explains that the workflow of Flash Signal comprises a step wherein "every call is transcribed automatically with speaker identification" and "hours of audio become searchable text within minutes of the call ending." Ex. R.







154. "Flash Signal" further practices the step associating metadata with each transcript, said metadata including an ID that identifies a person at said one or more facilities, a phone number associated with a third party, and a call duration. For example, and without limitation, "every call [is] transcribed with speaker ID." Ex. R; Ex. S.


Transcription &
Summary
Every call transcribed with speaker ID and condensed to a clear summary.


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Expand
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1
Lane, Corey
View Details




155. As a further example, and without limitation, Flash PD practices "[t]ranscription compliant with CJIS requirements, with speaker diarization." Ex. T. As an additional example, without limitation, on information and belief, Flash AI's diarization associates the transcription with metadata, including a person at the facility, a phone number associated with a third party, and a call duration.






156. As another example, without limitation, the "Flash Signal" dashboard displays a "Calls Snapshot" entry with a resident identifier ("RES-9575"), a duration ("32s"), and a third-party telephone number. Ex. S.




157. "Flash Signal" and "Flash PD" further practice the step of storing each of the plurality transcripts and associated metadata in a database. For example, and without limitation, Flash AI explains that Flash uses various encryption and storage methods to store content and its associated metadata in one place. Ex. U.

### 4.2 DATA AT REST

Flash uses AWS-managed and customer-managed **KMS keys** across the estate. Typical patterns include:

- **Object storage (S3)** with server-side encryption (managed keys or KMS).
- **Relational databases (RDS / Aurora)** with storage encryption via KMS.
- **DynamoDB** with encryption at rest (default or KMS-backed where configured).
- **Secrets Manager** secrets encrypted with KMS.
- **Block storage (EBS)** encrypted where provisioned.
- **Kubernetes (EKS)** envelope encryption for cluster secrets where enabled.
- **CloudTrail** log encryption and integrity validation.

158. As another example, and without limitation, Flash AI explains that the Flash AI platform connects and analyzes evidence from a variety of user-end systems. Ex. V.

**Doesn't my current evidence platform already do this?**

No. Most platforms store evidence from their own hardware only. Flash AI connects and analyzes evidence from all your systems: body cam video, phone extractions, case management data, documents, everything. We're the investigation layer that sits on top of all your data silos.

159. "Flash Signal" further practices the step of creating data analytics by determining running totals of call frequency and duration of calls by location at said one or more facilities. For example, and without limitation, demonstrations of the Flash Signal Platform show that Flash Signal tracks, stores, and determines at least: (i) the duration of a given call made or received by a given inmate; (ii) the number of weekly and monthly calls made or received by said inmate; (iii) the "Frequent Contacts" of said inmate; and (iv) the "facility location" of said inmate. On information and belief, the number of calls and identification of frequent contacts is continuously or periodically updated. Ex. S; Ex. W at 14.


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Expand
Lane, Corey
View Details
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1


Directory > Search Results > Jailhouse Sports Strategists > Lane, Corey
LC
Lane, Corey
INM-27694
Jailhouse Sports Strategists
TOTAL CALLS
0
HIGH-RISK CALLS
0
AVG RISK LEVEL
N/A
TOTAL DURATION
0m
CALLS THIS WEEK
0
CALLS THIS MONTH
0
AI Summary
Unable to generate summary.
Frequent Contacts
No contacts found.
Network Graph
Expand
Expand
Phone Numbers
No phone numbers found.
Topics 4
Play 1
Equipment 1
Game Plan 1
Other Team 1
Lane, Corey
View Details

Available options include:

- **Rows per page:** 25, 50, or 100
- **Table density:** Compact, Normal (default), Comfortable
- **Visible columns:** Toggle additional data fields such as:
  - Inmate ID
  - Facility location
  - Language
  - And more

**Click Apply Settings to save changes.**




160. "Flash Signal" and "Flash PD" each practice the step of providing said user interface on a display of a computer that has access to said database, said user interface displaying a call list of said audio calls in a field, each call in the call list having access to associated metadata, said user interface further includes one or more fields for searching said database to selectively display a number of audio calls during a particular period of time at a location of said one or more facilities, by one or more keywords, by one or more persons, and by call frequency of said one or

more persons. Ex. S. For example, and without limitation, on information and belief, call frequency can be discerned by searching or filtering on the "Flash Signal" user interface with reference to the "Frequent Contacts" panel and/or to the "Date" and "Status" filtering options and/or by entering into the search bar prompts designed to limit calls by call frequency.






161. For one example, and without limitation, each call displayed is linked back to the original call with exact timestamps and other identifying information such as location data. Ex. X; Ex. T; Ex. W at 19.


How does this hold up in court?

Every AI output links directly back to the original evidence with exact timestamps. The investigator stays in control. Flash accelerates the analysis. It's fully auditable and defensible.


02
ANALYZE
AI scans every file for names, locations, keywords, timestamps, behavioral cues, and cross-statement contradictions. Speaker diarization runs automatically on every audio and video file.

### 3.7 Searching and Filtering Calls

**Search Bar -** The search bar functions like a Google search:

- **Type keywords (names, objects, locations)**
- **Do not press Enter**
- **Results update automatically**




**Filters Panel -** Users can filter calls using two modes:

- **Match All** – Calls must meet all selected criteria
- **Match Any** – Calls meeting any selected criteria will appear

Filter options include:

- **Starred calls**
- **Date**
- **Risk level**
- **Objects**
- **Crime info**
- **Locations**
- **People**
- **Emotions**
- **Status**
- **Inmate ID**

162. As an additional example, and without limitation, on information and belief, the Flash "AI Chatbot with Chat Interface and AI Input Box" enables filtering results of searches according to call frequency. Specifically, the Flash AI Chatbot identifies "[c]all patterns

(frequency, timing, duration) between specific individuals." Ex. W at 25. In addition, on information and belief, the search bar and filters allow the selective display of calls based on call participants, location, date, keyword. Furthermore, on information and belief, the AI input box allows for natural language queries, so its capability of explicitly identifying call patterns such as frequency indicates the input box can be used to search calls based on frequency Ex. W at 28.

### 4.1 Chat Interface Overview

The main screen includes:

- **AI input box**
- **Model selector**
- **Right-side panel with:**
  - Insights
  - Calls
  - History



Once calls are loaded, users can ask questions such as:

- **Identifying contradictions**
- **Finding connections**
- **Tracking statements across calls**




163. Flash AI has directly infringed, and continues to directly infringe, claim 1 of the '440 Patent under 35 U.S.C. § 271(a) by using the claimed method in the United States without authority, including, for example and without limitation, by performing each of its steps through the Flash AI platform for calls taking place at WCI and, upon information and belief, for ODRC under the Contract as well as by performing each of its steps while testing the Flash AI platform. Flash AI performs the receiving, associating, storing, and analytics steps on computer systems that it owns, leases, or controls, including systems hosted in Amazon Web Services GovCloud. Ex. W at 39; Ex. U. Flash AI performs the step of providing the claimed user interface by generating and serving the Flash Signal interface to users' displays, including to Flash AI's own personnel, who

were authorized to maintain user accounts to access WCI call data through the platform. Ex. Y § 3.

164. To the extent any step of the claimed method is deemed performed by a Flash AI customer, that performance is attributable to Flash AI. Flash AI conditions its customers' use of Flash Signal on their use of the user interface that Flash AI designs, configures, hosts, and controls, and Flash AI establishes the manner and timing of that performance, including by provisioning user accounts, configuring the interface, determining which call data are ingested and when, and training users to operate the interface according to Flash AI's written instructions. Ex. W.

165. On information and belief, Flash AI has known or should have known of the '440 Patent, and of the manner in which the Flash AI platform infringes it, since no later than June 25, 2026. In addition, Flash AI has known or should have known of the '440 Patent, and of the manner in which the Flash AI platform infringes it, since no later than the service of this First Amended Complaint. Since that time, Flash AI has actively induced, and continues to induce, ODRC and its other customers to directly infringe by providing the Flash AI platform and instructing and training their personnel to use the infringing features, including through the Flash Signal Training Guide, which directs users step by step to review calls in the Call Records table, filter calls by date and inmate, view call metadata, and consult the Analytics module. Ex. W. On information and belief, Flash AI does so with the specific intent that those customers infringe by performing the claimed methods.

166. In addition, Flash AI contributes to the infringement of the '440 Patent under 35 U.S.C. § 271(c). ODRC and Flash AI's other customers directly infringe claim 1 by using Flash Signal in the United States. For example, since June 10, 2026, ODRC personnel at all twenty-eight

ODRC institutions have used it to review, search, and filter millions of inmate calls that Flash AI processes under contract on ODRC's behalf. Ex. E (Kucinic Aff.) ¶¶ 7, 15; Ex. W (Training Guide).

167. Flash AI sells and offers to sell in the United States subscriptions to, and licenses for, the components of Flash Signal that perform the claimed method. These are at least its Call Records module, its Analytics module, its search and filter functions, and the client-side software that generates its user interface (the "Accused Components"). Flash AI's customers include ODRC, which paid Flash AI approximately $1 million for June 2026 alone. Ex. E ¶ 32. The Accused Components are a material part of the claimed invention. They associate transcripts with inmate, telephone-number, and duration metadata; determine running totals of call activity by location; and display fields for searching calls by time, location, person, and call frequency. *See* ¶ [69]; Ex. W at []. They are especially made and adapted for that purpose and have no substantial noninfringing use.

168. Flash AI has known of the '440 Patent, and that its customers' use of the Accused Components infringes it, since at least June 25, 2026, and, additionally, since the service of this First Amended Complaint. Flash AI nonetheless continues to sell, offer, and provide the Accused Components, including under the ODRC Contract. LeoTech has been damaged as a result and is entitled to damages under 35 U.S.C. § 284.

169. Moreover, Flash AI has had knowledge of the '440 Patent and of its infringement thereof at least since June 25, 2026, when LeoTech notified Flash AI that it had reasons to believe that Flash AI was "offering certain software products, including at least its Flash PD and Flash Signal products, without having or securing from LEO Tech the requisite intellectual property rights to do so." Ex. J. LeoTech's ownership of the Asserted Patents is a matter of public record freely available on the U.S. Patent and Trademark Office assignment recordation database, among

other places. A reasonable actor in Flash AI's position would have reviewed this database or similar publicly available information to identify the '440 Patent. Accordingly, Flash AI's infringement of the '440 Patent since at least June 25, 2026, has been and continues to be willful.

170. In addition, in response to LeoTech's June 25, 2026, letter, Flash AI refused to provide any of the requested information and instead stated in conclusory fashion that it was "confident that no patent infringement of any LeoTech patents has occurred to date" and "considers this inquiry closed." Ex. N. Flash AI further asserted that "we believe these inquiries are better raised in formal discovery through your client's newly filed lawsuit in the Southern District of Ohio, which alleges violations of the Lanham Act, rather than through extrajudicial discovery." *Id.* Flash AI provided no indication that it performed any type of infringement or validity analysis on the '440 Patent, nor that it explored making changes to the Flash AI platform to avoid infringement. Accordingly, at a minimum, Flash AI was willfully blind to its infringement once it learned from LeoTech about its infringement and, on information and belief, chose not to investigate the extent of its infringement further.

171. On Saturday, September 19, 2026, at 12:10 a.m. EDT, in response to LeoTech's OPRA, the ODRC supplied several thousand pages of technical information about the Flash AI platform that confirmed that Flash AI's platform practices the limitations of the '440 Patent, contrary to Flash AI's summary conclusion to the contrary.

172. Had Flash AI actually investigated how its platform practices the '440 Patent, Flash AI would have formed a subjective belief of a high probability of infringement of the Asserted Patents arising from Flash AI's, and others', use of the Flash AI platform. Harboring that subjective belief, Flash AI could have and should have undertaken efforts to redesign the Flash AI platform so that it did not infringe the '440 Patent.

173. Based on the foregoing, LeoTech is informed and believes, and thereon alleges, that Flash AI either knew affirmatively that it was infringing and/or deliberately failed to further investigate whether its use of the Flash AI platform infringed the '440 Patent.

174. LeoTech is informed and believes, and thereon alleges, that after acquiring knowledge of the '440 Patent and its relevance to the Flash AI platform at the latest in June 2026, Flash AI continued to use the Flash AI platform in a manner that infringed the '440 Patent without (1) purchasing the '440 Patent , (2) obtaining a license to the '440 Patent , (3) appropriately investigating whether and/or to the extent to which it infringed the '440 Patent , (4) designing around the '440 Patent , or (5) taking any other actions to avoid infringing the '440 Patent. By pursuing this course of action rather than behaving in a lawful manner, Flash AI improperly attempted to avoid paying fair compensation to LeoTech for its use of LeoTech's patented technology and/or improperly attempted to avoid having to modify the Flash AI platform, which would have resulted in problems including production delays, increased costs, and/or decreased performance.

175. Flash AI has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for LeoTech's patent rights. By way of example only, Flash AI has continued to use the Flash AI platform accused of infringing the '440 Patent as of June 25, 2026. LeoTech is informed and believes, and thereon alleges, that Flash AI has taken no steps to design around the '440 Patent in the Flash AI platform as it existed before June 25, 2026. By pursuing this course of action rather than behaving in a lawful manner, Flash AI improperly attempted to avoid paying fair compensation to LeoTech for its use of LeoTech's patented technology and/or improperly attempted to avoid having to modify the Flash AI platform, which

would have resulted in problems including production delays, increased costs, and/or decreased performance.

176. Flash AI's willful infringement of the Asserted Patents is compounded by Flash AI's reckless disregard for or willful blindness of LeoTech's patent rights in view of the notice that Flash AI was provided with the filing of this First Amended Complaint. At a minimum, such filing gives rise to a subjective belief by Flash AI of a high probability of infringement by Flash AI's use of the Flash AI platform accused of infringing the Asserted Patents. However, Flash AI deliberately failed to investigate whether its use of the Flash AI platform infringed the '440 Patent. Having deliberately failed to perform an investigation of its own regarding whether its use of the Flash AI platform infringed the '440 Patent, Flash AI, at a minimum, willfully blinded itself to LeoTech's patent rights.

177. As a result of Flash AI's infringement of the '440 Patent, LeoTech has been damaged. LeoTech is entitled to recover enhanced damages for the damage it has sustained as a result of Flash AI's wrongful acts in an amount subject to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, LeoTech prays that the Court enter judgment in LeoTech's favor on all Counts and award the following relief:

1. That the Court enter a preliminary and permanent injunction against Flash AI and each of its owners, officers, affiliates, subsidiaries, associates, directors, officers, agents, servants, and employees and all others acting under Flash AI's direction or control or acting in concert therewith, from continuing to make false or misleading representations about the nature, characteristics, qualities, quantities, or benefits of Flash AI's products and services;

2. That the Court order Flash AI to notify ODRC immediately that Flash AI made false or misleading representations to ODRC regarding Flash AI's Flash Signal system;

3. That the Court order Flash AI to disgorge its profits and the Court award LeoTech treble the disgorged profits pursuant to 15 U.S.C. § 1117(a);

4. That the Court award LeoTech compensatory damages in an amount to be proven at trial;

5. That the Court award LeoTech punitive damages;

6. That the Court find this to be an exceptional case and award LeoTech its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a) and/or Ohio Revised Code § 4165.03(B) and costs;

7. That the Court enter judgment in favor of Plaintiff LeoTech that Flash AI has been and is infringing at least claim 1 of the '895 patent and claim 1 of the '440 patent pursuant to 35 U.S.C. §§ 271(a), 271(b), and/or 271(c);

8. That the Court enter a preliminary injunction, pending trial and final judgment in this action, enjoining Flash AI , its officers, agents, servants, employees, attorneys, affiliates, representatives, successors, assigns, and all persons acting in active concert or participation with any of them who receive actual notice of the injunction, from directly or indirectly making, using, selling, offering to sell, licensing, providing, deploying, implementing, maintaining, or otherwise commercially exploiting Flash AI's accused inmate-call transcription service, including the existing Flash AI platform in its entirety, or any product, system, service, platform, software, feature, functionality, or colorable variation thereof that practices one or more claims of the Asserted Patents;

9. That the Court enter a permanent injunction enjoining Flash AI and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert or privity with any of them from infringing any of the Asserted Patents without additional compensation to LeoTech in an amount to be determined by the Court;

10. That the Court enter a judgment awarding LeoTech all damages adequate to compensate it for Defendant's infringement of the Asserted Patents, under 35 U.S.C. § 284, and in no event less than a reasonable royalty for Flash AI's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law, and also any past damages permitted under 35 U.S.C. § 286, as a result of Flash AI's infringement of the Asserted Patents.

11. That the Court award enhanced damages for willful infringement up to three times the amount of damages, pursuant to 35 U.S.C. § 284.

12. That the Court award an assessment of costs, including reasonable attorney fees pursuant to 35 U.S.C. § 285;

13. That the Court award LeoTech prejudgment interest at the maximum legal rate; and

14. That the Court award LeoTech such other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ T. Earl LeVere*

T. Earl LeVere, Trial Attorney
Kristina Dahmann
Ryland A. Doerr
**ICE MILLER LLP**
250 West Street, Suite 700
Columbus, Ohio 43215
T: 614.462.2700
F: 614.462.5135
Earl.LeVere@icemiller.com
Kristina.Dahmann@icemiller.com
Ryland.Doerr@icemiller.com
*Counsel for Plaintiff Leo Technologies, LLC*

OF COUNSEL:

Benjamin W. Hattenbach (*pro hac vice* forthcoming)
**Irell & Manella LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
T: 310-203-7937
bhattenbach@irell.com

Kamran Vakili, Ph.D (*pro hac vice* forthcoming)
**Irell & Manella LLP**
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
T: 949-760-5151
kvakili@irell.com

Michael M. Rosen (*pro hac vice* forthcoming)
**Irell & Manella LLP**
750 17th Street NW, Suite 850
Washington, DC 20006
T: 202-777-6520
mrosen@irell.com

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury to the extent authorized by law.

*s/ T. Earl LeVere*
T. Earl LeVere